IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

JULIA MILLS and TERESA )
RATCLIFF, )
 )
    Plaintiffs, )
 )
v. )  CV95-H-962-NE
 )
GREGORY WYNN and IMOGENE DEAN,)
 )
    Defendants. )

FILED
97 MAY -5 PM 3:05
U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED

MAY - 5 1997

## MEMORANDUM OF DECISION

Presently before the Court is the March 26, 1997 motion for summary judgment filed by defendants Gregory Wynn and Imogene Dean. Pursuant to an Order entered on March 28, 1997, the motion was deemed submitted, without oral argument, on April 25, 1997.

### I. Procedural History

Plaintiffs Julia Mills and Teresa Ratcliff commenced this action on April 18, 1995 by filing a two-count complaint in this Court. Plaintiffs sued Gregory Wynn and Imogene Dean, as well as Jackson County District Attorney Dwight Duke, and Ralph Grider, a Jackson County Juvenile Court judge. Plaintiffs also named the members of the Jackson County Commission as defendants. The complaint alleged that defendants Wynn and Dean had physically assaulted plaintiffs on May 10, 1994, and that defendant Duke had refused to prosecute Wynn and Dean for this offense. Plaintiffs

also alleged that defendant Grider had refused them access to unspecified documents and had conspired with Duke, Wynn, and Dean to fabricate criminal charges against plaintiffs. The complaint sought redress under both 42 U.S.C. § 1983 and Title II of the Americans with Disabilities Act,[1] and included several affidavits regarding the alleged assault and the refusal of defendant Duke to prosecute Wynn and Dean. Plaintiffs alleged <u>respondeat superior</u> liability on the part of the Jackson County Commission for the actions of Duke and Grider.

Filed with the complaint was a motion for leave to proceed <u>in forma pauperis</u>, a motion for appointment of counsel, and a motion for a temporary restraining order. By an Order dated April 21, 1995, the Court dismissed plaintiffs' claims under Title II of the ADA and the claims against Grider and Duke under § 1983, reasoning that those claims were frivolous under 28 U.S.C. § 1915. The Court expressly noted that both Duke and Grider would be entitled to absolute immunity under § 1983, and noted that plaintiff's complaint failed to state a claim under Title II of the ADA. The Court dismissed the <u>respondeat superior</u> claim against the Jackson County commission due to the lack of <u>respondeat superior</u> liability under § 1983. The Court also dismissed plaintiff Ratcliff's § 1983 claim against defendant Dean and dismissed plaintiff Mills' § 1983 claim against

---

[1] The complaint alleged that plaintiff Teresa Ratcliff was a disabled individual.

2

defendant Wynn, because the complaint reflected allegations that defendant Dean had assaulted plaintiff Mills and that defendant Wynn had assaulted plaintiff Ratcliff. As part of the same Order, the Court granted plaintiffs' motion to proceed in forma pauperis with regard to these remaining claims, denied the motion for appointment of counsel, and denied the motion for a temporary restraining order.

On May 8, 1995, plaintiff filed a "motion to appeal," which the Court treated as a notice of appeal from the April 21, 1995 Order. On October 19, 1995, the Court of Appeals issued an opinion dismissing plaintiffs' appeal, since the Court's April 21, 1995 Order was not a final judgment and was not certified under Fed. R. Civ. P. 54(b).

After a period of inactivity in the case, the Court set a trial date by an Order entered March 12, 1997. That same Order required each party to submit a pre-trial narrative statement describing that party's position and listing witnesses and exhibits to be introduced at trial.

A further review of the file caused the Court to doubt whether defendants Wynn and Dean had been acting under color of state law in connection with the alleged May 10, 1994 assaults on plaintiffs. Thus, on March 20, 1997, the Court ordered plaintiffs to submit a statement indicating how defendants Wynn and Dean had acted under color of state law in connection with the assault.

On March 26, 1997, defendants Wynn and Dean filed the present motion for summary judgment, asserting that they did not act under color of state law at any time. Defendants attached their own affidavits to the effect that neither had ever worked for any governmental agency, state or federal. Defendants also supplied the Court with various documents reflecting proceedings in the Juvenile Court of Jackson County, Alabama and in the Probate Court of Hillsborough County, Florida. As explained below, these proceedings form the basis for the real dispute between plaintiffs and defendants in this case, namely the custody of a minor child.

On March 28, 1997, plaintiffs filed their response to the Court's March 20, 1997 Order. The response reiterated the § 1983 claims against defendants Duke and Grider by asserting that they had violated plaintiffs' due process rights by issuing arrest warrants for plaintiff Julia Mills' arrest and by refusing to prosecute defendants Wynn and Dean for the May 10, 1994 assault. There was no assertion in the response regarding how Wynn and/or Dean had acted under color of state law in allegedly assaulting plaintiffs.

After reviewing plaintiffs' March 28, 1997 response, the Court entered an Order canceling the trial date set for this action and setting up a briefing schedule for defendants' motion for summary judgment.

Plaintiff filed her pre-trial narrative statement on March

4

31, 1997, setting forth a detailed recitation of the facts.  On the same day, plaintiffs also filed evidentiary materials consisting of records of proceedings in the Circuit Court of Jackson County (the felony charges against plaintiff Mills and her daughter, Jennifer Dunn) and the Juvenile Court of Jackson County.  Finally, plaintiffs filed an evidentiary submission in opposition to the motion for summary judgment on April 14, 1997, essentially reiterating their prior statements and the allegations in the complaint.

## II. Standards for Evaluating a Summary Judgment Motion

Under Fed.R.Civ.P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the Court of the basis for its motion, and identifying those portions of the pleadings or filings, which it believes demonstrate the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own

5

affidavits, or by the depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial. Celotex, 477 U.S. at 324.

The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Id. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. Fitzpatrick, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant,

probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district Court that there is an absence of evidence to support the non-moving party's case. <u>Fitzpatrick</u>, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the Court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary

deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. Lewis v. Casey, ___ U.S. ___, 116 S. Ct. 2175 (1996).

### III. Relevant Undisputed Facts

This case arises from a protracted and apparently bitter dispute between plaintiff Julia Mills and defendants Wynn and Dean over the custody of a minor child, Sally Jean. The Court details this custody dispute solely to set the background for the § 1983 claims asserted against Wynn and Dean; the Court does not purport to decide any issue connected with either the custody proceeding or the criminal charges filed against plaintiff Mills and Jennifer Dunn.

Plaintiff Julia Mills is Sally Jean's maternal grandmother; Sally Jean's mother, Jennifer Dunn, is plaintiff Mills' daughter. Plaintiff Teresa Ratcliff is plaintiff Mills' daughter and is the sister of Jennifer Dunn. Defendant Gregory Wynn asserts that he is Sally Jean's father, and Wynn's parents, defendant Imogene Dean and her husband Mack Dean, currently have custody of Sally Jean. Plaintiff Mills disputes Wynn's paternity of Sally Jean.

The Court records submitted to the Court establish that, on June 22, 1993, Jennifer Dunn signed an affidavit indicating that she was unemployed and unable to care for the needs of her

8

daughter, Sally Jean. (Motion for Summary Judgment, Ex. D). That affidavit also indicated that Jennifer Dunn believed that it was in Sally Jean's best interest to be in the custody of Imogene and Mack Dean. (Id.). Handwritten additions at the bottom of the affidavit indicated that Dunn desired frequent visitation with Sally Jean, and also expressed a desire that "no visitation rights be granted to the maternal grandparents, John E. Mills or Julia F. Mills." (Id.). Plaintiffs contend that this affidavit was induced by some unspecified fraud committed by Mack Dean. (Dunn Aff.).

On July 1, 1993, Ralph Grider, a judge of the Juvenile Court of Jackson County, Alabama, entered an Order finding that Sally Jean was a dependent child, that her natural parents were unable to care for her, and that Mack and Imogene Dean were suitable guardians. (Motion for Summary Judgment, Ex. C). Thus, Judge Grider ordered that temporary custody of Sally Jean be placed with Mack and Imogene Dean. (Id.).

On July 9, 1993, plaintiff Julia Mills filed a number of documents in the Probate Court of Hillsborough County, Florida, seeking appointment of herself as Sally Jean's guardian. (Id., Ex. E). Those documents reflected the fact that Mills was aware of the ongoing proceedings in the Jackson County Juvenile Court; the documents also reflected the fact that Sally Jean was, at that time, with Mack and Imogene Dean in Stevenson, Alabama. (Id.). On July 13, 1993, the Hillsborough County Court made

9

plaintiff Julia Mills the temporary plenary guardian of Sally Jean. (Id.). According to plaintiffs, Judge Grider refused to accept the judgment of the Hillsborough County Probate Court. (Plaintiff's 3/31/97 "Support to Pre-trial Statements," at 2).

On April 5, 1994, Judge Grider entered an Order granting a motion by Jennifer Dunn for blood paternity tests of Sally Jean's possible fathers. (Motion for Summary Judgment, Ex. F.). Judge Grider ordered blood tests to be performed on Jennifer Dunn, Sally Jean, and three men, including defendant Gregory Wynn. (Id.). The testing was to take place at a facility in the basement of the Jackson County Courthouse on May 10, 1994, at 10:00 a.m. (Id.).

May 10 arrived, and Jennifer Dunn, Sally Jean, plaintiff Mills, plaintiff Ratcliff, defendants Dean and Wynn, and others came to the Jackson County Courthouse for the blood tests. Without dispute, there was a physical confrontation between plaintiffs and defendants at that time, and the record contains two different stories about what happened and why.

Plaintiffs' version of the story[2] begins with the arrival of plaintiffs at the courthouse in a van. Plaintiffs were inside the van, and Jennifer Dunn was standing by the driver's side of the van with Henry Outlaw, Sr., who is Dunn's grandfather. Defendants Wynn and Dean arrived in a car with Sally Jean. Dunn

---

[2]The version of events set out here is taken from plaintiffs' March 31, 1997 pre-trial narrative statement.

10

went over to that car and took Sally Jean back to the van to show the child to Outlaw, Mills, and Ratcliff. After about five minutes, defendant Imogene Dean asked for the child back, and Dunn asked if she could hold the child a bit longer. At this point, according to plaintiffs, defendant Gregory Wynn began yelling at Dunn in an attempt to get the child back, and commenced hitting Jennifer Dunn and pulling her hair. Plaintiff Teresa Ratcliff got out of the van to assist Jennifer Dunn, at which time Wynn began to attack Ratcliff, knocking her to the ground and kicking her. Defendant Dean reached in through the driver's side window of the van and took the keys from the ignition. Then, Dean and Wynn dragged plaintiff Julia Mills out of the van and hit and kicked her. Both Mills and Ratcliff managed to escape and re-enter the van, and the two of them, accompanied by Jennifer Dunn and Sally Jean, left the courthouse parking lot in search of a hospital. They became lost, flagged down a police officer, and pulled over, only to find out that Imogene Dean had been hanging on to the ladder on the back of the van since they had departed the parking lot.

Defendants' version of the story differs from Mills' account in several important aspects. Rather than summarizing it, the Court will simply quote the testimony of Imogene Dean at a September 22, 1994 hearing before Judge Grider in the Jackson County Juvenile Court:

> Q. Could you tell the Court about the

incident that occurred when you had the blood testing up here at the courthouse.

A. We had to be here at 10:00 for the blood test and we got here about 20 till; and Jennifer, her mother, and her sister and her grandfather and her uncle were all there. And Jennifer ran to the car and got the baby out of her car seat and me and her were in the back seat. And she went to running up and down the street; cars were having to stop for her and she would take it and jump in the car with this guy and run back. At 10 minutes till, I told Jennifer to let me have the baby, that it was time for the blood test. She hollered no and she jumped in the van. She went running towards the van. Her mother slid out on the driver's side and Jennifer slid right in with the baby.

Q. And then what happened?

A. There was pushing and shoving and pulling and tugging and us trying to get the baby. They all got in the van and locked it and drove up 72. I got on the back of the van before they backed out.

Q. The back of the van on the --

A. On the ladder.

* * *

Q. Did they keep continually driving off?

A. Yes, they did. Mrs. Mills went to back out at the courthouse. There was a little red and white pickup truck coming behind her. I screamed for him to stop so she couldn't back out with the baby. He stopped and she was backing on out and he knew if she backed on out that I would be caught between the van and the truck. So he went on. When he got to the exit, he got crossways so she couldn't get out and Mrs. Mills went over the curb, and she almost lost it; and the baby's daddy was hanging on to the door handle and they slung him off when she went over the curb.

Q. Did they try to sling you off?

A. Yes, they did.

Q. Was the van weaving back and forth?

A. Yes, it was.

Q. How did you finally get stopped?

A. I seen a cop meeting us and he turned around right in the middle of the road, got behind the van. When he turned the siren on, I felt the van just ride up, she just smashed it. He run her from Lucky's on down to Adams Chicken Basket before he could get her to stop. He screamed and yelled lady, why didn't you stop, didn't you hear me. She said yeah, but I was going to the hospital. He said the hospital is not this way.

\* \* \*

(cross-examination by Jennifer Dunn)

Q. Did you ever strike anyone there at the scene: me or my sister or my mother?

A. I certainly did. I slapped your mother. When she slid out of the van and let you slide in with that baby, I slapped her. I sure did. I will not deny it.

Q. And did anyone ever strike Teresa Ratcliff?

A. They sure did.

Q. Who was that?

A. My son, the baby's daddy.

Q. What did he strike her for?

A. Because she was trying to help you and your mother kidnap that baby and get gone.

(Transcript of 9/22/94 hearing at 27-32, attached to plaintiffs'

13

3/31/97 "support to pre-trial statements"). Apparently, after the police intervened, the blood tests were conducted as planned.

Plaintiffs assert that the police and/or Jackson County District Attorney Dwight Duke refused to press charges against Wynn and Dean as a result of this incident. Plaintiff Julia Mills also submitted Court records indicating that she and Jennifer Dunn were charged with third degree assault, reckless endangerment, and interference with child custody.

The results of the blood tests indicated that Gregory Wynn was Sally Jean's father. Judge Grider held an evidentiary hearing on September 22, 1994, and issued a decision on October 10, 1994, awarding permanent custody of Sally Jean to Mack and Imogene Dean. (Motion for Summary Judgment, Ex. H). That order noted the fact that plaintiff Julia Mills and Jennifer Dunn had attempted to kidnap Sally Jean on May 10, 1994, and Judge Grider found that it was in Sally Jean's best interest to remain with the Deans. (Id.).

Finally, it is undisputed that neither defendant Wynn nor defendant Dean have ever worked for any governmental agency. (Dean Aff.; Wynn Aff.).

### IV. Analysis

The only claims remaining in this action are the § 1983 claims against Wynn and Dean for the alleged assault of May 10,

14

1994.  The parties' accounts of the events of May 10 differ significantly, but one thing is certain from both accounts: whatever assault Wynn and Dean may have perpetrated on plaintiffs, there was no state action.

An essential element of a claim under § 1983 is that the plaintiff show the deprivation of a constitutional right under color of state law.  Here, the evidence in the record, viewed in a light most favorable to plaintiffs, establishes that Wynn and Dean used physical force against plaintiffs.  However, there is no evidence to indicate that the scuffle on May 10, 1994 involved anyone other than private citizens.  Nothing in the record suggests any state involvement in the May 10 incident, other than the fact that the police stopped plaintiffs' van to prevent defendant Imogene Dean from being thrown from the back of the van at highway speed.

To conclude, these § 1983 claims seek redress for assaults allegedly committed by private citizens acting without state involvement.  Because the record indicates that there was no state action connected with the assaults, defendants Wynn and Dean are entitled to judgment as a matter of law.  An appropriate separate Order and Judgment will be entered.

DONE this _5th_ day of May, 1997.

SENIOR UNITED STATES DISTRICT JUDGE